UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

KERI SPRING, EUGENE SPRING,
JULIANNE SPRING, EUGENE SPRING and
KERI SPRING on behalf of GREGORY
SPRING, and KERI SPRING as the duly
appointed administrator of the ESTATE OF
GREGORY SPRING,

                    Plaintiffs,

     v.

ALLEGANY-LIMESTONE CENTRAL
SCHOOL DISTRICT, THE BOARD OF
EDUCATION OF THE ALLEGANY-
LIMESTONE SCHOOL DISTRICT, KEVIN
STRAUB, Principal, DIANE LOWRY, Teacher
Assistant, JOHN DOE(S), and JANE DOE(S),

                Defendants.

**DECISION AND ORDER**

14-CV-476S

## I.  INTRODUCTION

In this action, Gregory Spring's family members and the administrator of his estate seek damages from the school district and certain employees for violating Gregory's rights under the Americans with Disabilities Act and the Rehabilitation Act and for the intentional infliction of emotional distress after his death. Before this Court is the motion for summary judgment of the Allegany-Limestone Central School District, the Board of Education of the Allegany-Limestone Central School District, and principal Kevin Straub (Docket No. 143).[1] For the reasons that follow, Defendants' motion will be granted in part and denied in part.

---

[1] Defendant Diane Lowry's motion for summary judgment on Plaintiffs' claim for intentional infliction of emotional distress will be addressed in a separate decision and order.

1

## II.  BACKGROUND

The parties contest many of the facts in this case. This Court notes their respective positions where applicable and will take the facts in the light most favorable to Plaintiffs, the non-moving party. See Mitchell v. City of New York, 841 F.3d 72, 75 (2d Cir. 2016) (at summary judgment, a court "views the evidentiary record in the light most favorable to ... the non-moving party").

Gregory Spring was the son of Plaintiffs Keri and Eugene Spring, and the brother of Plaintiff Julianne Spring. He was diagnosed as a child with Tourette's Syndrome, Callosum Dysgenesis,[2] and Attention Deficit Hyperactivity Disorder (ADHD). (Keri Spring Affidavit, Docket No. 158-4 at p.1; Docket No. 166 at pp. 4-5.) Gregory's Tourette's Syndrome manifested in verbal and physical tics, which included repetitive speech, foul language, eye blinking, and tapping a pencil. (Docket No. 143-38, ¶ 26; Docket No. 158-13, ¶ 301; Docket No. 166 at p. 5.) Gregory's Callosum Dysgenesis limited his ability to comprehend, process, and retain information. (Docket No. 158-13, ¶¶ 298-99.) Gregory had an Individualized Education Plan ("IEP") in place during his time at Allegany-Limestone school, beginning after his first year of second grade and continuing through his sophomore year in high school, when he died. (Docket No. 143-38, ¶¶ 31-33.)

Records submitted by Defendants reveal that Gregory had multiple disciplinary episodes during middle and high school, including altercations with other students, and that his mother frequently contacted Defendants with her concerns about Gregory's

---

[2] Disorders of the corpus callosum involve "problems with the connection between the left and the right side of the brain (termed the corpus callosum). …Children with disorders of the corpus callosum have a range of learning abilities and disabilities. The level of difficulty depends on the number of brain structure problems and the presence of other syndromes. Some children have mild learning problems. Others have severe intellectual disabilities." https://www.urmc.rochester.edu/childrens-hospital/developmental-disabilities/conditions/corpus-callosum.aspx.  Accessed 5/12/2022 at 12:00 PM.

discipline and bullying that Gregory was experiencing.

**2009-10 School Year (Seventh Grade)**

Gregory was disciplined in middle school for punching a student known as C.F. (Docket No. 143-58, ¶ 85.) According to Keri, C.F. called Gregory a misfit, retard, and idiot. (Id., ¶¶ 83-86.) On March 12, 2010, both Gregory and K.M. were disciplined by teacher Christopher Kenyon for horsing around. (Id., ¶ 93.) Plaintiffs assert that K.M. was tapping a pencil and mimicking Gregory's tics; Defendants assert that Gregory was not being bullied and that both students were to blame. (Docket Nos. 143-38, ¶ 96; 158-12, ¶ 96.)

Gregory played on the school baseball team in seventh grade. Keri observed his teammates mocking his tics, and Gregory complained to her of this treatment as well. (Docket No. 143-38, ¶¶ 99-102.) Keri also testified that Gregory was bullied by his baseball coaches, who said he was unmotivated, a symptom Keri attributed to Gregory's ADHD. (Id., ¶ 99.)

**2010-2011 School Year (Eighth Grade)**

During Gregory's eighth-grade year, he received several disciplinary detentions. (Docket No. 143-38, ¶ 13.) On October 25, 2010, he punched another student in the mouth and served detention. (Id., ¶ 45.) On November 12, 2010, he received detention for shoving a student in the hallway. (Id., ¶ 46.) On January 19, 2011, he received detention for running down the hallway pushing and shoving other students (Id., ¶ 47, see also Docket No. 143-25 at pp. 8-9.) On January 21, 2011, Gregory told teacher's aide Diane Lowry to shut up. (Id., ¶ 48, see also Docket No. 143-24 at pp. 5-6.)

On January 25, 2011, Gregory received detention for disruptive behavior during

3

detention. (Docket No. 143-29 at p. 1.) Keri emailed the school asking if Gregory could serve his detention separately from others who had misbehaved; she explained that he had just started a new ADHD medication after discontinuing his former medication, and that she hoped Defendants would soon see an improvement in his behavior. (Docket No. 143-25 at p. 2.)

On March 28, 2011, Gregory received detention for being disruptive during class, including shouting out, not paying attention to directions, and getting frustrated when he did not know what to do. (Docket No. 143-29 at p. 1.) On May 13, 2011, Gregory received detention for cheating on a quiz. (Id.) Plaintiffs assert that Gregory copied another student's answers because he was not given the accommodation, provided for in his IEP, of taking tests in a separate room free from distractions. (Docket No. 158-12, ¶ 52.)

Plaintiffs claim that Gregory experienced bullying by other students during his eighth-grade year. On September 8, 2010, Keri emailed then principal Timothy McMullen to inform him that K.M. and K.M.'s sibling had been bullying Gregory and calling him "retard." (Docket No. 158-8 at p. 12.) McMullen replied and promised he would look at all sides of any issue. (Id.)

Gregory overheard teachers Gilbert and Missel calling him "druggie and misfit". (Docket No. 143-38, ¶ 104.) In March 2011, Gregory signed a "contract for conduct" after he and students P. and A. called each other names, including "pussy," "slut," and "bitch." (Docket Nos. 143-38, ¶ 108; 143-36 at p. 2.) The "contract" does not reference any disability-based terms or insults. (Id.)

Gregory submitted Student Response forms on October 25, 2010, and March 10, 2011, indicating that he and another boy had been called "butt buddies." (Id., ¶ 91-92,

Docket No. 143-27 at pp. 1-2.) Gregory told Keri that he left notes reporting bullying in the "bully box." (Docket No. 143-38, ¶ 113.) Keri did not remember what Gregory told her he had reported. (Id.)

**2011-2012 School Year (Ninth Grade)**

Gregory experienced disciplinary issues during the ninth grade as well. (Docket No. 143-38, ¶ 13.) District records reflect that on December 1, 2011, he received detention when he stripped down to his underwear in the hallway. (Docket No. 143-29.)

On April 5, 2012, the "baseball incident" took place. Gregory was engaged in horseplay during baseball practice and kicked another student in the groin. (Docket No. 130-38, ¶ 115.) This behavior was prevalent in the middle school and the high school. (Docket No. 158-13, ¶¶ 417-18.) Superintendent Karen Geelan was aware that this "game" existed. (Docket No. 158-13, ¶ 443; Docket No. 143-17 at p. 35.) After Gregory kicked the student, baseball coach Kenyon told Gregory to sit on the bench. (Docket No. 143-38, ¶ 117.) On his way to the bench, Gregory said the "F word" several times (Id., ¶ 118.) Kenyon asserted that Gregory also said, "Mr. Kenyon you can suck it." (Id., ¶ 120.) Kenyon told Gregory to leave practice immediately and wait for a ride. (Id., ¶ 121.) When Gregory's sister Julianne Spring arrived, she brought him to Kenyon to apologize, but, according to Plaintiffs, Kenyon would not listen to Gregory. (Docket No. 158-12, ¶ 122.) Kenyon called Keri that evening and told her Gregory was removed from the team. (Docket No. 143-38, ¶125.) Kenyon later stated that he would have removed from the team any student who behaved as Gregory had. (Id., ¶ 126). Kenyon was aware that Gregory had Tourette's Syndrome and Callosum Dysgenesis. (Docket No. 158-13, ¶¶ 425.)

Keri attempted to address this incident and get Gregory reinstated on the team.  In an email dated April 16, 2012, Keri requested a meeting with Dr. Geelan to discuss a violation of confidentiality when another student was allowed to see Gregory's IEP and to discuss bullying that Gregory was experiencing due to his Tourette's. (Docket No. 158-8 at p. 33.) Dr. Geelan testified that she met with Keri but did not recall when. (Docket No. 143-17 at p. 36.)  On April 18, 2012, after the meeting, Keri emailed Dr. Geelan expressing concern with how the baseball incident was handled and inquiring about the policy for removing children from sports teams. (Docket No. 158-8 at p. 34.) Dr. Geelan did  not respond. (Docket No. 158-12, ¶ 129.)

Plaintiffs state that Keri met Kenyon and athletic director John Luce two months later and that both admitted that the horseplay on the team had been going on prior to Gregory's incident. (Docket No. 158-13, ¶ 437.) Keri testified that Eric Hemphill, the varsity baseball coach, told her on a separate occasion that Gregory would never play baseball at Allegany Limestone as long as he was the coach. (Id., ¶ 441, Docket No. 143-10 at pp. 143-44.)

Straub, the principal, testified that other students on sports teams who misbehaved, for example by using alcohol or drugs, were suspended but ultimately were allowed back on their teams. (Docket No. 158-13, ¶ 427; Docket No. 143-12 at pp. 74-75.) Straub did not recall any coach imposing an outright ban on any nondisabled students. (Docket No. 143-12 at p. 77.)

**2012-2013 School Year (Tenth Grade)**

Plaintiffs assert that Gregory was bullied in the tenth grade by fellow students and former defendants Michael Easton and Jacob Roewe, who are brothers. Keri testified—

6

based on what Gregory had told her—that Easton called Gregory a retard or idiot during almost every meeting of their shared gym class. (Docket Nos. 143-38, ¶ 140; Docket No. 158-13, ¶ 448.)[3] Keri also testified that Easton told Gregory that he was going to kill him, called his girl friends sluts and whores, and laughed at Gregory's tics. (Id., ¶ 141).

Easton, on the other hand, testified that he did not even know Gregory's name until the "locker room incident," an altercation on November 8, 2012, discussed below. (Docket No. 142-14 at p. 26.) Easton also testified that he was not aware that Gregory had a disability and that he never said anything derogatory about Gregory. (Docket Nos. 143-38, ¶ 138; 143-14 at p. 77.)

Keri testified that she spoke with principal Straub about bullying in general several times and about Michael Easton bullying Gregory in gym class at least twice. (Docket No. 143-10 at pp. 17, 22, 83, 88, 89.)[4] In deposition testimony, Straub confirmed that Keri had informed him that Gregory was being bullied in general around 2 or 3 times. (Docket No. 143-12 at p. 93.)  When asked directly whether Keri had told him that other students were mocking Gregory's tics, Straub stated, "Mrs. Spring may have told me that. (Id. at p. 140.)

On November 8, 2012, in what the parties refer to as the "locker room incident," Gregory picked up Michael Easton and slammed him against a locker several times. (Docket No. 143-38, ¶ 164.) Gregory "screamed" at Easton, but Easton does not recall what Gregory said. (Docket No. 143-14 at p. 81.) Keri testified that when she and Gregory met with Straub after the incident, Gregory stated—in Straub's presence—that Easton

---

[3] This, and most of Keri's claims of bullying by Easton and Roewe and other students, are supported only by Keri's testimony of what Gregory told her. Defendants challenge all of this evidence as inadmissible hearsay if used to establish the fact that Easton and Roewe or other students bullied Gregory.

[4] Defendants claim that this testimony contradicts Keri's testimony at her 50-h examination, where she stated that she did not speak to Straub about Easton before the locker room incident. (See Docket No. 143-38, ¶¶ 152-54.)

had been bullying him and that he told Easton to stop. (Docket No. 143-10 at p. 21.) Easton went to the emergency room immediately after the incident and stayed out of school for three days after it. (Docket No. 143-14 at p. 85.)

Straub gathered statements from witnesses and the substitute gym teacher who had been on duty. (Docket No. 143-38, ¶ 175.) Straub did not take a statement from Gregory like he did from the other students. (Docket No. 143-12 at p. 106.) Straub testified that he had heard that Gregory had told Easton to "stop talking shit" but he did not recall Gregory's explanation of the matter. (Id. at pp. 102, 110.) An entry on a spreadsheet Straub kept reflects that he discussed this incident with Keri on the day it happened. (Docket No. 143-34 at p. 1.)[5]

Michael Easton pressed criminal charges against Gregory after the locker room incident. Plaintiffs assert that Straub encouraged Easton and his family to press charges (Docket No. 158-12, ¶ 190) but Straub denied doing this (Docket No. 143-38, ¶ 190). Easton testified that he pressed charges because he wanted to. (Docket No. 143-14 at p. 75.) The charges were resolved with an adjournment in contemplation of dismissal. (Id., ¶ 194.)

Gregory was given a 2-day suspension from school for his conduct in the locker room incident. (Docket No. 143-38, ¶ 185.)

Straub's spreadsheet indicates that he talked with Keri on November 9, 2012, and that she told him Easton was bullying Gregory. (Docket No. 143-34 at p. 1.) Straub

---

[5] In support of their motion, Defendants submit a "spreadsheet" created by Straub to record his meetings with parents. This document appears to have been physically cut and pasted; the rows and columns do not line up and several numerical entries are clearly missing. Straub testified at one point that he took notes of every meeting with parents (Docket No. 143-12 at p. 41, 94-95) but testified at another point that sometimes he took notes and sometimes he did not. (Id. at p. 35.)

testified that on November 14, 2012, he had Gregory give him a list of names and that Straub gave that list to the DASA[6] coordinator to investigate. (Docket No. 143-10 at pp. 134-35.)  The record contains "student incident reports" apparently filled out by students who witnessed the incident. (Docket No. 143-32.) Among these reports is an untitled handwritten document with "G. Spring" written on it in a different script. The author states that Easton was putting him down, "by basically calling me a loser, saying that I won't go to college." (Docket No. 143-32 at p. 3.) The record also contains notes by "Greta," the DASA coordinator, dated November 27, 2012. (Docket No. 143-32 at pp. 17-18.)  These notes do not discuss the allegations that Easton was telling Gregory that he would never go to college.

Keri met with Straub after the locker room incident. (Docket No. 143-10 at p. 84.) On November 27, 2012, Keri told Straub that she wanted Michael Easton disciplined. (Docket No. 143-38, ¶ 196.) The District's DASA coordinators determined that Easton was not in need of discipline. (Id., ¶ 196.) Straub testified that an investigation (it is unclear if this is the DASA investigation or another investigation) determined that an incident had occurred at a party before the locker room incident between B.S., who was a friend of Gregory's, and Easton. (Id., ¶¶ 179-80.) Easton was not disciplined as a result of the locker room incident. (Id., ¶ 195.) Straub's spreadsheet indicates that Greta, the DASA

---

[6] DASA, or New York State's Dignity for All Students Act, took effect on July 1, 2012. It "amended Section 801-a of New York State Education Law regarding instruction in civility, citizenship, and character education by expanding the concepts of tolerance, respect for others and dignity to include: an awareness and sensitivity in the relations of people, including but not limited to, different races, weights, national origins, ethnic groups, religions, religious practices, mental or physical abilities, sexual orientations, gender identity, and sexes. [It] further amended Section 2801 of the Education Law by requiring Boards of Education to include language addressing The Dignity Act in their codes of conduct. Additionally, under the Dignity Act, schools [are] responsible for collecting and reporting data regarding material incidents of discrimination, harassment, and bullying." https://www.p12.nysed.gov/dignityact/, accessed 5/12/2022 at 12:24 p.m.

coordinator, concluded that Easton did not deserve discipline, but needed help in adjusting to his new school. (Docket No. 143-34 at p. 2.)

Keri testified that she met with Straub "multiple times" in the month following the locker room incident. (Docket No. 143-10 at p. 90.) Straub testified that Keri informed him two or three times that Gregory was being bullied. (Docket No. 143-12 at p. 93.) He stated elsewhere that Keri "always wanted bullying to be addressed." (Id. at p. 131.) On December 7, 2012, Keri gave Straub a book called "Words Matter," with a bookmark at the section called "When a Bully Comes to Town." (Docket No. 143-38, ¶¶ 203-04; Docket No. 143-12 at p. 130.) There is no record evidence of the District or Straub responding to Keri's allegations that Gregory was being bullied.

After the locker room incident, Gregory told Keri that Easton and his brother, Jacob Roewe, came regularly to his place of work and harassed him. (Docket No. 143-10 at pp. 45, 167, 317.) Easton testified that he saw Gregory at work only once, that he stayed by his father's side the whole time he was there, and that he never returned to Gregory's workplace. (Docket No. 143-14 at pp. 91-92.)

Gregory also told Keri that Roewe was coming up to him at lunch and threatening to kill him during the spring of 2013, and that he would go to Gregory's work with Easton and harass Gregory. (Docket No. 143-38, ¶ 238; Docket No. 143-10 at pp. 166, 226-29, 307, 313-14.) Keri testified that she complained twice to Straub of Roewe's treatment of Gregory, and Straub said he would investigate. (Docket No. 143-10 at pp. 318-19.) Straub did not recall Keri ever telling him that Easton and Roewe were going to Gregory's work. (Docket No. 143-12 at pp. 146-47.) Roewe denied bullying Gregory; he testified that he never saw Gregory at school, in classes, in sports, or in the lunchroom. (Docket No. 143-

38, ¶ 220, Docket No. 143-15 at pp. 22, 25-26.)  Roewe further testified that he did not know where Gregory worked and never visited him there. (Docket No. 143-15 at p. 30.)

The District asserts that the middle school and high school had their lunches at different times and that Roewe never shared the lunchroom with high school students while he was in middle school. (Docket No. 143-38, ¶¶ 245-46.) Julianne Spring attested that, when she was a student in the District, she observed students entering the lunchroom even when it was not their lunch period. (Docket No. 158-11 at p. 2.)

On June 17, 2013, Gregory Spring died from a single, self-inflicted gunshot wound to the head. (Docket No. 143-38, ¶ 276). New York state police subsequently interviewed his girlfriend, who stated that Gregory had threatened that he would harm himself if he could not continue a relationship with her. (Docket No. 143-38, ¶ 283.) Gregory's family testified that they had no indication before June 17, 2013, that Gregory was going to commit suicide. He left nothing behind indicating the reason for his suicide. (Docket No. 143-38, ¶ 294.)

Sometime after Gregory's death, someone posted a comment on the website of the funeral home stating, "Ha, ha, ha; he's dead. I hope he's in hell." (Docket No. 158-13, ¶ 569.)

The District determined that Gregory had not made reports in the bully box or to the school's DASA coordinators. (Docket No. 143-38, ¶ 285.) Straub, the principal, was unaware of who managed the bully box, or what happened to documents placed in the bully box. (Docket No. 158-13, ¶¶ 369-71.) In September 2012, the bully box was discontinued and complaints were to be filed online. (Docket No. 143-38, ¶ 76.) Keri affirmed that she was not given notice of this change. (Docket No. 158-13, ¶ 374.)

**Procedural History**

Plaintiffs commenced this action on June 17, 2014. (Docket No. 1.) On September 30, 2015, this Court granted Defendants' motions to dismiss Plaintiffs' amended complaint. (Docket No. 70.) Plaintiffs appealed this Court's decision. On August 4, 2016, the Second Circuit affirmed in part, vacated in part, and remanded. (Docket No 78; Spring v. Allegany-Limestone Cent. Sch. Dist., 655 F. App'x 25 (2d Cir. 2016) (Summary Order).) The Second Circuit affirmed this Court's dismissal of Plaintiffs' substantive due process, equal protection, retaliation, Monell liability, and state constitutional claims. But it found that Plaintiffs had sufficiently alleged that Gregory was disabled under the ADA and RA and remanded those discrimination claims to this Court for further consideration. (Id.)

Plaintiffs filed their second amended complaint, as directed by this Court, on August 31, 2016. (Docket No. 80.) Defendants moved to dismiss that complaint and this Court granted the motion in part and denied it in part, finding that Plaintiffs' proposed third amended complaint sufficiently stated a claim against Straub, the School District, and the School Board for discrimination under the ADA and RA, and against Easton and Roewe under New York civil rights law, but dismissing Plaintiffs' claims as to all other individual defendants. (Docket No. 96.)

Plaintiffs' claims against Roewe and Easton were dismissed by stipulation on November 13 and November 14, 2019, respectively. (Docket Nos. 124, 125.)

The District defendants moved for summary judgment on June 18, 2021. (Docket No. 143). Diane Lowry, who was separately represented, also moved for summary judgment. (Docket No. 142, 144.) Briefing concluded on September 7, 2021, after which this Court took the motions under advisement without oral argument.

12

## III.  DISCUSSION

Plaintiffs claim that the District, the Board, and Straub violated Gregory's and their rights under the ADA and RA by discriminating against Gregory based on his disability. Plaintiffs seek compensatory damages from the District and Board (referred to for convenience collectively as "the District") and injunctive relief against the District and Straub in his official capacity.

The District and Straub move for summary judgment on Plaintiffs' claims.

## A.    Summary Judgment

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion."  Addickes v. S.H. Kress and Co., 398 U.S. 144, 158-59, 90 S. Ct.1598, 1609, 26 L. Ed. 2d 142 (1970).  "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper."  Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). Indeed, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004) (citations omitted).

13

But a "mere scintilla of evidence" in favor of the nonmoving party will not defeat summary judgment.  Anderson, 477 U.S. at 252.  A nonmoving party must do more than cast a "metaphysical doubt" as to the material facts; it must "offer some hard evidence showing that its version of the events is not wholly fanciful."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading...."); D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998).  That is, there must be evidence from which the jury could reasonably find for the non-moving party.  See Anderson, 477 U.S. at 252.

In the end, the function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.  "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996).

"Rule 56 (e)'s requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavit also means that an affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial." Patterson v. Cty. of Oneida, N.Y., 375 F.3d 206, 219 (2d Cir. 2004). "Therefore, only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997).

14

**B.     Americans with Disabilities Act and Rehabilitation Act**

Plaintiffs claim that the District and Straub discriminated against Gregory based on his disabilities, in violation of the ADA and RA.

**1.  Legal Standards**

Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the RA, likewise, states, "[n]o otherwise qualified individual with a disability in the United States, …, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794. Claims arising under the two acts are analyzed in an identical fashion. Henrietta D. v. Bloomberg, 331 F.3d 262, 272 (2d Cir. 2003).

"To make out a *prima facie* case under the ADA or Rehabilitation Act, a plaintiff must show '(1) that [he] is a qualified individual with a disability; (2) that the defendants are subject to [the pertinent statute]; and (3) that [he] was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of [his] disability.'" Est. of D.B. by Briggs v. Thousand Islands Cent. Sch. Dist., 327 F. Supp. 3d 477, 527–28 (N.D.N.Y. 2018) (citing Preston v. Hilton Cent. Sch. Dist., 876 F. Supp. 2d 235, 241 (W.D.N.Y. 2012) (citing Harris v. Mills, 572 F.3d 66, 73-74 (2d Cir. 2009)).

A school district may be liable for ADA violations under two theories: for its own direct discrimination or for its deliberate indifference to discrimination. Courts in the

Second Circuit and elsewhere have applied the Supreme Court's holding in Davis v. Monroe County Board of Education to peer-on-peer harassment cases under the ADA and RA. Eskenazi-McGibney v. Connetquot Cent. Sch. Dist., 84 F. Supp. 3d 221, 232 (E.D.N.Y. 2015) (Spatt, J.) (citing Davis v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 651-652, 119 S. Ct. 1661, 143 L. Ed. 2d 839 (1999)). To succeed on a claim of deliberate indifference to disability-based peer-on-peer harassment, a plaintiff must show that (1) he was harassed on the basis of his disability; (2) the harassment was so severe, pervasive, and objectively offensive that it altered his education; (3) the school district had actual notice of the disability-based harassment; and (4) the school was deliberately indifferent to it. Preston, 876 F. Supp. 2d at 243 (citing Davis, 526 U.S. at 651-52). The harm a plaintiff must show is that he "was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of [his] disability." Est. of D.B., 327 F. Supp. 3d at 527–28.

Deliberate indifference is found where a school's "response to known discrimination 'is clearly unreasonable in light of the known circumstances.'" Preston, 876 F. Supp. 2d at 242 (quoting Gant v. Wallingford Bd. of Educ., 195 F.3d 134, 141 (2d Cir. 1999)).

### 2. A reasonable jury could find that Gregory was disabled under the ADA and RA.

Defendants argue first, as a threshold matter, that summary judgment is warranted because Gregory did not have a qualifying disability. Plaintiffs counter that Gregory's Tourette's Syndrome, Callosum Dysgenesis, and ADHD substantially limited him such that he was disabled under both statutes.

Although disability was originally strictly defined under the ADA, Congress

16

amended the ADA in 2008 to "substantially broaden[] the definition of a disability under the law." Graham v. Three Vill. Cent. Sch. Dist., No. 11-CV-5182, 2013 WL 5445736, at *27 (E.D.N.Y. Sept. 30, 2013). The amended ADA defines "disability" as: (1) a physical or mental impairment that substantially limits one or more major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment. 42 U.S.C. § 12102 (1); Graham, 2013 WL 5445736, at *10–11. "Major life activities" include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102 (2).

Under the 2008 amendments, an asserted disability will "be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of the chapter." 42 U.S.C. § 12102 (4); Graham, 2013 WL 5445736, at *11–13. The ADA does not "require medical evidence to establish a genuine dispute of material fact regarding the impairment of a major life activity at the summary judgment stage[,]" though "conclusory declarations are insufficient[.]" Rodriguez v. Vill. Green Realty, Inc., 788 F.3d 31, 43-44 (2d Cir. 2015).

Defendants argue that Gregory's diagnosis of Tourette's Syndrome does not establish a disability and that Keri's "lay testimony" does not make clear what Callosum Dysgenesis is or how it affected Gregory. But this Court finds, having considered the record as a whole, that there is a genuine question of material fact whether Gregory was disabled.

The record in this case contains more than a "mere" diagnosis. Rather, it contains evidence—both medical records and behavioral observations—from which a jury could

find that the impairments of Tourette's Syndrome, Callosum Dysgenesis, and ADHD, singly or in combination, limited Gregory's ability to communicate appropriately and learn.

A letter from David Lichter, M.D., dated July 26, 2010, to Gregory's primary care physician, referred to Gregory's attentional problems and issues with comprehension and processing. (Docket No. 166 at p. 5-6.) Dr. Lichter noted that Gregory had a learning disability likely linked to his Callosum Dysgenesis and that tics were breaking through with the onset of puberty, including the spontaneous use of the "F word." (Id.)

On April 7, 2011, school psychologist Robert Decker performed a psychosocial evaluation of Gregory. (Docket No. 166 at pp. 110-114.) Decker noted that Gregory had dysgenesis of the corpus callosum, and that sufferers of this condition often "experience challenges with social interactions due to difficulty imagining potential consequences of behavior, being insensitive to the thoughts and feelings of others, and misunderstanding social cues (for example, being vulnerable to suggestion, gullible, and not recognizing emotions communicated by tone of voice)." (Docket No. 166 at p. 111.) Decker stated, "between the Tourette's and the Collosum Dysgenesis, Greg seems to at times have problems with controlling his behaviors and having emotional reactions to situations that otherwise might not bother him." (Id.) Decker referred to self-esteem and behavioral issues that had brought Gregory disciplinary referrals. (Id. at p. 113.) He also noted that Gregory had average cognitive abilities and was overall doing well academically in middle school. (Id. at p. 113.)

The record further contains evidence that Gregory exhibited behavior that could have resulted from these conditions, and that this behavior inhibited his ability to concentrate and communicate. For example, on March 28, 2011, Gregory received

detention for being disruptive in class, shouting out, not paying attention to directions, and getting frustrated when he did not know what to do. (Docket No. 143-29 at p. 1.) When Gregory was told to sit on the bench at baseball practice on April 5, 2012, he shouted out the "F word" several times. (Docket No. 143-38, ¶ 118.) A reasonable jury could find that these incidents demonstrate an inability to concentrate or communicate that resulted from his diagnosed conditions.

Defendants argue that evidence of Gregory's ability to function, including the facts that he was on track to obtain a Regents diploma, had a part time job, was active in sports, and was allowed to use a firearm without supervision, shows that he could not have been disabled. (Docket No. 143-39 at p. 5.) But these abilities do not necessarily disprove that Gregory had impairments that substantially limited his ability to learn, concentrate, or communicate. Rather, they raise a question of fact as to the extent of Gregory's limitations. A reasonable jury could conclude that the medical opinions of record along with the behavior for which Gregory was disciplined suffice to establish a qualifying disability.

### 3. IDEA exhaustion was not required for all of Plaintiffs' claims.

Defendants also argue that Plaintiffs' claims are barred because they failed to exhaust their claims pursuant to the Individuals with Disabilities Education Act ("IDEA").

"[A] plaintiff bringing suit under the ADA, the Rehabilitation Act, or similar laws must in certain circumstances—that is, when 'seeking relief that is also available under' the IDEA—first exhaust the IDEA's administrative procedures." Fry v. Napoleon Cmty. Sch., ___ U.S. ___, 137 S. Ct. 743, 750, 197 L. Ed. 2d 46 (2017) (discussing 20 U.S.C. § 1415 (l) (2006)). "A plaintiff's failure to exhaust administrative remedies under the IDEA

19

deprives a court of subject matter jurisdiction." <u>Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist.</u>, 288 F.3d 478, 483 (2d Cir. 2002) (citing <u>Hope v. Cortines</u>, 69 F.3d 687, 688 (2d Cir. 1995)).

But exhaustion for claims arising under the ADA or RA is not necessary "when the gravamen of the plaintiff's suit is something other than the denial of the IDEA's core guarantee—what the Act calls a 'free appropriate public education ("FAPE").'" <u>Fry.</u>, 137 S. Ct. at 748 (quoting § 1412(a)(1)(A)). Where nothing in a plaintiff's suit suggests a focus on the adequacy of the disabled student's education, the IDEA exhaustion requirement likely does not apply. <u>Parker-Leon v. Middle Vill. Preparatory Charter Sch.</u>, No. 17CV4548NGGRML, 2019 WL 2394211, at *4 (E.D.N.Y. June 6, 2019).

Plaintiffs do not identify any of their causes of action as arising under the IDEA. Insofar as they argue that Defendants directly discriminated against Gregory by denying him an IEP, that claim required exhaustion under the IDEA and this Court lacks jurisdiction to consider it. But the gravamen of Plaintiffs' claims is not the denial of a FAPE or the inadequacy of the education afforded to Gregory, but rather direct discrimination unrelated to his IEP and deliberate indifference to disability-based bullying. This Court finds that Plaintiffs' claims did not require IDEA exhaustion and will examine them pursuant to the ADA and RA.

### 4. ADA and RA Discrimination Claims

Plaintiffs argue both that Defendants directly discriminated against Gregory because of his disabilities and that they were deliberately indifferent to disability-based bullying that Gregory experienced. This Court will address these arguments in turn.

### a. Direct Discrimination

Defendants argue that Plaintiffs' direct discrimination claim fails because there is no evidence that Gregory's disability was a factor in—let alone the cause of—any of the discipline Gregory received.

To survive summary judgment, a jury must be able to find that Gregory "was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of [his] disability." Est. of D.B., 327 F. Supp. 3d at 527–28. A crucial requirement is a showing of causation. Under the RA, "the defendant must have discriminated against the plaintiff 'solely' because of the plaintiff's disability, whereas under the ADA, it is enough if the plaintiff's disability was a motivating factor in the discrimination." Doe v. E. Irondequoit Cent. Sch. Dist., 16-CV-6594 (CJS), 2018 U.S. Dist. LEXIS 76798, *71 (W.D.N.Y. May 7, 2018) (citing Murphy v. Bd. of Educ. of Rochester City Sch. Dist., 273 F. Supp.2d 292, 314 (W.D.N.Y. 2003), aff'd, 106 F. App'x 746 (2d Cir. 2004)). Under both statutes, Plaintiffs must raise an issue of fact regarding a causal connection between Gregory's disability and the District's actions.

For most of the disciplinary incidents in the record, the record here would not permit a reasonable jury to find a causal connection between Gregory's disability and the District's actions. Apart from the baseball incident, which this Court discusses below, the discipline Gregory received was for behavior that, presumably, any student would be disciplined for:  running in the hallway, stripping down to his underwear, and pushing and shoving. Plaintiffs argue that all of Gregory's behavior was caused by his disability. But absent any evidence of animus against Gregory because of his disability, or evidence that non-disabled students were punished less severely—or not at all—for the same

behavior, a reasonable jury would have no basis to find that the District disciplined Gregory *because of* his disability and not simply because of the disruptive behavior itself. Plaintiffs' direct discrimination claims as to all discipline excepting the baseball incident will therefore be dismissed.

This Court does find, however, that Plaintiffs have raised an issue of fact regarding District's response to the baseball incident. On the one hand, Coach Kenyon stated that he would have punished in the same way any student who acted as Gregory did. On the other hand, Kenyon was aware of Gregory's disability, a major expression of which was shouting out, including use of the "F word." Further, Principal Straub testified that other team members who misbehaved, for example, by using drugs or alcohol, received suspensions but were allowed to return to their teams. Straub was not aware of any non-disabled student being removed permanently from a team. There is thus a question of fact whether Gregory was treated differently from non-disabled students.

Further, the District appears not to have given Gregory and his family the process they were due under the District's code of conduct when removing him from the team. The District's Code states that when a student is suspended from athletic activity, he and his parents shall receive a "reasonable opportunity for an informal conference with the district official imposing the suspension to discuss the conduct and the penalty involved." (Docket No. 143-9 at pp. 24-25.) In her emails to Dr. Geelan, Keri referenced Gregory's disabilities and requested a meeting or at least that she be provided with the rules governing the situation. Keri did not receive these things, and Gregory was never reinstated to the baseball team. All of these facts could permit a reasonable jury to find that Gregory was disciplined differently from non-disabled students because of his

disability.

To defeat summary judgment, Plaintiffs must show that there is a genuine issue of material fact whether Gregory "was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of [his] disability." Est. of D.B., 327 F. Supp. 3d at 527–28. Because there are issues of fact regarding Defendants' discipline of Gregory after the baseball incident, summary judgment is not warranted on Plaintiffs' direct discrimination claims related to that incident. Plaintiffs' direct discrimination claims insofar as they are premised on any other actions by Defendants will be dismissed.

### b. Deliberate Indifference Claim

Plaintiffs also argue that the District discriminated against Gregory through its deliberate indifference to the disability-based bullying that he endured. Defendants argue that summary judgment is warranted on this claim because no facts suggest that Gregory was bullied due to his disabilities, all Plaintiffs' claims of bullying are based on inadmissible hearsay, and, regardless, the District acted reasonably in all instances.

To succeed on a claim of deliberate indifference to disability-based harassment, Plaintiffs must show that: (1) Gregory was harassed on the basis of his disability; (2) the harassment was so severe, pervasive and objectively offensive that it altered his education; (3) the school district had actual notice of the disability-based harassment; and (4) the school was deliberately indifferent to it. Preston, 876 F. Supp. 2d at 243 (citing Davis, 526 U.S. at 651-52).

### i. A reasonable jury could find that bullying was linked to Gregory's disability.

Defendants first argue that Plaintiffs have failed to bring forth admissible evidence

23

from which a jury could conclude that any bullying Gregory experienced was related to his disability.

This Court finds that Plaintiffs have created an issue of fact as to the basis of Gregory's being bullied. As examples of evidence of the fact of disability-based bullying, Keri testified that: she saw students mocking Gregory's tics at seventh-grade baseball practice and that the "same thing" went on at eighth grade baseball practice;[7] she perceived Gregory regularly coming home upset and informing her that he had been bullied and that other students were mocking his tics; and she heard him inform Straub of Easton's bullying him when she, Gregory, and Straub met after the Locker Room Incident. As further evidence, Defendants themselves submit a document with the name G. Spring written on it. This document states that Easton was putting him down, calling him a loser, and saying he would never go to college. (Docket No. 143-32 at p. 3.) Taken in the light most favorable to Plaintiffs, this could be evidence that Easton bullied Gregory on the basis of his disabilities.

Defendants argue that Plaintiffs' only evidence of disability-related bullying is Keri's testimony about what Gregory told her. They argue that this is inadmissible hearsay if offered for the fact that Gregory was bullied.[8] But even disregarding the evidence Defendants argue is hearsay, and not resolving that issue at this time, this Court finds that the record contains sufficient evidence from which a reasonable jury could conclude

---

[7] Defendants argue that anything that happened before June 13, 2011, i.e., 3 years before Plaintiffs commenced this action, is time barred by the statute of limitations. Assuming that Keri observed members of the baseball team mocking Gregory's tics after that date, there is no issue. Even if the conduct was before that date, her testimony that the same behavior occurred in eighth grade connects that conduct to conduct that occurred within the statute of limitations.

[8] Plaintiffs argue that this Court should apply the general hearsay exception under Rule 807 and allow Keri's testimony about her conversations with Gregory to be admitted for the truth of Gregory's being bullied. This Court declines to apply this exception at this juncture, since it finds sufficient evidence of disability-based bullying without the use of the evidence that Defendants argue is hearsay.

that Gregory was bullied on the basis of his disabilities.

Defendants argue, correctly, that some of the incidents Plaintiffs refer to—the middle school insults of "butt buddy" and "slut," Easton's calling Gregory's girlfriends "sluts," Roewe's threats to kill Gregory—are not disability-related. They caution that the ADA and RA must not become a "generalized anti-bullying statute." Eskenazi-McGibney, 84 F. Supp. 3d at 233. It is true that some of the incidents Plaintiffs point to do not indicate disability-based bullying. However, Plaintiffs have brought forward other admissible evidence from which a reasonable jury could determine that Gregory was bullied due to his disabilities. Summary judgment is therefore not warranted on this issue.

> ### ii. A reasonable jury could find that Defendants had notice of disability-based bullying.

Defendants argue that Plaintiffs only have hearsay evidence to support their notice of Gregory being bullied. This is not the case.

In an email of April 16, 2012, following the baseball incident, Keri requested a meeting with Superintendent Geelan to discuss bullying Gregory was experiencing due to his Tourette's. (Docket No. 158-8 at p. 33.) At the meeting with Gregory and Straub after the locker room incident, on November 8, 2012, Keri heard Gregory tell Straub that Michael Easton had been bullying him. (Docket No. 142-10 at p. 21.) The paper apparently submitted by Gregory alleged that Easton was putting him down, calling him a loser, and saying that he would never go to college. (Docket No. 143-32 at p. 3.) Keri testified that she met twice with Straub after the locker room incident regarding Roewe bullying Gregory, and Straub said he would investigate. (Docket No. 142-10 at p. 318-19.) Straub stated in his deposition that Keri informed him two or three times that Gregory was being bullied. (Docket No. 143-12 at p. 93.) He stated elsewhere that Keri "always

wanted bullying to be addressed." (Id. at p. 131.) In response to the question whether Keri had notified him that people were mimicking Gregory's tics, Straub answered, "she may have told me that." (Id. at p. 139.) On December 7, 2012, Keri gave Straub a book called "Words Matter," with a bookmark at the section called "When a Bully Comes to Town." (Docket No. 143-38, ¶¶ 203-04; Docket No. 143-12 at p. 130.)

Only some of these instances specifically refer to disability-based bullying. Defendants argue that there is insufficient evidence that they were notified specifically of disability-based bullying. But a parent's testimony that she complained about a certain kind of bullying can suffice to create an issue of fact regarding a school's notice. I.T. v. New York City Dep't of Educ., 15-CV-3894 (WFK), 2020 U.S. Dist. LEXIS 133614, *18-21 (E.D.N.Y. July 14, 2020) (plaintiff mother's testimony that she complained to the school and superintendent's office about use of racial slur toward her son created a genuine dispute of material fact as to whether defendants had actual knowledge of alleged bullying). This Court finds that the evidence presented, as discussed, in addition to the District's knowledge of Gregory's disabilities and their symptoms, would be sufficient to allow a jury to find that the District was on notice that Gregory was being bullied due to his disabilities.

### iii.   A reasonable jury could find that Defendants were deliberately indifferent.

To establish that the District was deliberately indifferent to bullying, Plaintiffs must show that its response was "'so clearly unreasonable in light of the known circumstances' as to give rise to a reasonable inference that the defendant himself intended for the harassment to occur." DiStiso v. Cook, 691 F.3d 226, 240–41 (2d Cir. 2012) (quoting Gant, 195 F.3d at 141). Deliberate indifference "is 'not a mere "reasonableness" standard'

that transforms every school disciplinary decision into a jury question." Id.

Here, the known circumstances include the District's knowledge of Gregory's disability, the discipline Gregory received for saying the "F word" at baseball practice when the District knew this was a symptom of his Tourette's, and the District's notice—discussed above—that Gregory was being bullied at least in part based on his disabilities. The District does not point to any evidence that it took action based on these circumstances. Straub stated in his deposition that "DASA coordinators" determined that Easton did not need disciplining after the locker room incident, and Defendants submit several pages of notes that appear to be an investigation into other students' perceptions of Easton. (Docket No. 143-32 at pp. 17-19.) But the focus of this investigation was Easton's interactions with other students, not Gregory's or Keri's complaints about Gregory being bullied.

In other cases where defendants have defeated a deliberate-indifference claim, they have been able to point to actions they took or provide concrete reasons they consciously chose not to act. For example, in Gant, a case regarding deliberate indifference to race-based harassment, a teacher who had been notified that a kindergartner had called a Black kindergartner a racial slur testified at her deposition "that, in her view, it would have caused more harm than good if she had attempted to discuss the incident with the entire class" and that she had decided the appropriate response was 'to keep an open eye' on the situation." Gant, 195 F.3d at 142. The Second Circuit agreed with the District Court that, given this explanation, there was no basis for a jury to find that the teacher's failure to respond directly "was so clearly unreasonable as to amount to deliberate indifference." Id. Here, on the other hand, the record contains no explanation

of why Defendants apparently did nothing, despite the notice they received.

A reasonable jury could find it clearly unreasonable to take no action in the face of notice that a student was being bullied based on his disabilities. Summary judgment is therefore not warranted on this basis.

### iv.    A reasonable jury could conclude that Gregory was effectively denied equal access to Defendants' resources and opportunities.

Finally, Defendants argue that Plaintiffs have not raised a question of fact whether any bullying Gregory experienced was "so severe, pervasive, and objectively offensive" that he was "effectively denied equal access to [its] resources and opportunities." Preston, 876 F. Supp. 2d at 241 (quoting Davis, 526 U.S. at 650-651). Defendants point to Gregory's relatively high grades in tenth grade, ranging from the 70s to the 90s, as evidence that he was not deprived of access to an education. (Docket No. 143-35 at p. 1.) They also point to evidence that demonstrates a possible intervening cause of Gregory's suicide: text messages he sent to his girlfriend threatening to harm himself and punish her for refusing to communicate with him. (See State Police Report, Docket No. 143-23 at pp. 5-6.) Defendants argue that Gregory's suicide, therefore, cannot be seen as a result of his having been bullied.

It is true that Gregory had good grades. Nor did he drop out of school or have excessive absences, as in other cases where courts have found the severity prong to be met. See Zeno v. Pine Plains Cent. Sch. Dist., 702 F.3d 655, 667 (2d Cir. 2012) (plaintiffs established severity of harassment where Black student transferred from Regents diploma track to BOCES vocational track due to persistent racial harassment); Preston, 876 F. Supp. 2d at 241–42 (plaintiffs stated a claim where disabled student discontinued attending school, became profoundly disturbed, and was so emotionally crippled that he

was unable to return to class or complete final exams after regularly being harassed and bullied, including being called "fucking retard" and "autistic piece of shit."). And the record contains evidence of possible other reasons for Gregory's suicide. But the fact remains that Gregory did not finish his education. The determination of to what extent the bullying he experienced caused this deprivation of his education is for the jury.

### 4. Plaintiffs' claims for injunctive relief are moot.

In a previous decision, this Court dismissed all claims against Principal Straub except those seeking injunctive relief from him in his official capacity, pursuant to Ex Parte Young. (See Docket No. 96 at p. 18.) This Court permitted Plaintiffs' claims for injunctive relief as against the District to proceed.  Defendants now argue that Plaintiffs' claims for injunctive relief, including those against Straub in his official capacity, are mooted by Gregory's death.

Plaintiffs do not address this argument in their briefing. As such, this Court finds that Plaintiffs have abandoned this claim. See Malik v. City of New York, 841 F. App'x 281, 284 (2d Cir. 2021) ("When a party fails adequately to present arguments in a brief, a court may properly consider those arguments abandoned.") (quoting State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada, 374 F.3d 158, 172 (2d Cir. 2004) (internal quotation marks omitted).

This Court also finds that Plaintiffs' claims for injunctive relief are indeed moot and merit dismissal. A case is moot, and federal courts have no jurisdiction over the litigation, when "'the parties lack a legally cognizable interest in the outcome.'" Cty. of Los Angeles v. Davis, 440 U.S. at 631, 99 S. Ct. 1379, 1383, 59 L. Ed. 2d 642 (1979) (quoting Powell v. McCormack, 395 U.S. 486, 496, 89 S. Ct. 1944, 1950–51, 23 L. Ed. 2d 491 (1969));

Bragger v. Trinity Capital Enter. Corp., 30 F.3d 14, 16 (2d Cir.1994) (same). "[T]he mootness doctrine ensures that the litigant's interest in the outcome continues to exist throughout the life of the lawsuit, including the pendency of the appeal." Cook v. Colgate Univ., 992 F.2d 17, 19 (2d Cir.1993) (citations omitted) (equitable claims against university mooted by graduation of plaintiffs).

The Second Circuit has "consistently held that students' declaratory and injunctive claims against the universities that they attend are mooted by the graduation of the students, because after their graduation and absent a claim for damages, ''it becomes impossible for the courts, through the exercise of their remedial powers, to do anything to redress the injury.'" Cook, 992 F.2d at 19 (quoting Alexander v. Yale Univ., 631 F.2d 178, 183 (2d Cir.1980)).

Here, Plaintiffs ask this Court to require the District and Straub, in his official capacity, to correct all discriminatory practices, mandate training for employees and students about discrimination, and require annual reports demonstrating their efforts and success at compliance in providing a "discrimination, harassment and bully free education environment."  (Third Amended Complaint, Docket No. 97 at p. 23.)

Because Gregory is no longer a student of the District, no plaintiff now has a "legally cognizable interest" in this injunctive relief. Fox v. Bd. of Trs. of State Univ. of New York, 42 F.3d 135, 139–40 (2d Cir. 1994) (holding that Plaintiffs, once they had left the SUNY system, could not receive any legally cognizable benefit from the injunctive relief they sought from the SUNY system). Therefore, this Court will dismiss as moot Plaintiffs' claims for injunctive relief as against the District and as against Principal Straub in his official capacity.

**5.  Keri Spring has standing to bring ADA and RA claims.**

Defendants argue that Keri lacks standing to bring ADA and RA claims on her own behalf, based on discrimination against Gregory.  They argue that Keri should be required to prove that she suffered her own independent injury apart from any discrimination against Gregory.

This Court agrees with other district courts in this circuit that parents "have standing to bring ADA and Rehabilitation Act claims on their own behalf when their disabled child was the one directly injured because 'a parent of a child with a disability has a particular and personal interest in preventing discrimination against the child.'" Doe v. United States Secy. of Transp., 17-CV-7868 (CS), 2018 U.S. Dist. LEXIS 206239, *21 (S.D.N.Y. Dec. 4, 2018) (quoting A.M. ex rel. J.M. v. N.Y.C. Dep't of Educ., 840 F. Supp. 2d 660, 675 (E.D.N.Y. 2012) (internal quotation marks omitted) (collecting cases), aff'd sub nom. Moody ex rel. J.M. v. N.Y.C. Dep't of Educ., 513 F. App'x 95 (2d Cir. 2013) (summary order)). This Court finds, therefore, that Keri has standing to pursue her claims against the District.

### III. CONCLUSION

Plaintiffs have raised genuine issues of material fact regarding whether the District directly discriminated against Gregory based on his disability in its handling of the baseball incident. Defendants' motion for summary judgment will be denied as to the baseball incident, but granted as any other claims Plaintiffs assert regarding direct discrimination. Plaintiffs have also raised genuine issues of material fact regarding whether the District was deliberately indifferent to disability-based harassment, and Defendants' motion as to that claim will also be denied.

## IV.  ORDERS

IT HEREBY IS ORDERED, that Defendants' Motion for Summary Judgment (Docket No. 143) is GRANTED IN PART and DENIED IN PART.

FURTHER, that the parties shall re-engage in mediation.

FURTHER, that this case is REFERRED for alternative dispute resolution under Section 2.1.B of the Plan for Alternative Dispute Resolution in the United States District Court for the Western District of New York ("the ADR Plan").

FURTHER, that the parties shall comply with all relevant requirements of the ADR Plan, which is available at http://www.nywd.uscourts.gov.

FURTHER, that within seven days of this decision, the parties shall contact ADR Administrator Amanda G. Williams for direction on how to proceed with mediation under the March 16, 2020, General Order Re: Alternate Dispute Resolution Under Circumstances Created by COVID-19 and its progeny.

FURTHER, that the parties are permitted to engage in mediation with another federal-court mediator upon whom they might agree.

FURTHER, that the parties shall conclude their mediation efforts and file a joint written notice concerning the status of mediation by July 24, 2022.

SO ORDERED.


Dated:        May 17, 2022
              Buffalo, New York


                                              s/William M. Skretny
                                            WILLIAM M. SKRETNY
                                         United States District Judge