UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

KERI SPRING, EUGENE SPRING,
JULIANNE SPRING, EUGENE SPRING and
KERI SPRING on behalf of GREGORY
SPRING, and KERI SPRING as the duly
appointed administrator of THE ESTATE OF
GREGORY SPRING,

        Plaintiffs,

        v.

ALLEGANY-LIMESTONE CENTRAL
SCHOOL DISTRICT, THE BOARD OF
EDUCATION OF THE ALLEGANY-
LIMESTONE SCHOOL DISTRICT, KEVIN
STRAUB, Principal, DIANE LOWRY, Teacher
Assistant, JOHN DOE(S) and JANE DOE(S),

        Defendants.

**DECISION AND ORDER**

14-CV-476S

## I.   INTRODUCTION

In this action, family members and the administrator of the estate of Gregory Spring

seek damages from the Allegany-Limestone Central School District and School Board

and from several District employees for violating Gregory's rights under the Americans

with Disabilities Act and the Rehabilitation Act. Plaintiffs also seek damages from

teacher's aide Diane Lowry for the emotional distress caused by comments she posted

online after Gregory's suicide. Before this Court is Defendant Lowry's motion for summary

judgment, which this Court will grant for the following reasons.[1] (Docket No. 142, 144.)

---

[1] The School District's, School Board's, and Kevin Straub's motion for summary judgment (Docket
No. 143) will be resolved in a separate decision and order.

## II.  BACKGROUND

Unless otherwise noted, the following facts are undisputed for purposes of the motion for summary judgment. This Court takes the facts in the light most favorable to Plaintiffs, the non-moving party. See Mitchell v. City of New York, 841 F.3d 72, 75 (2d Cir. 2016) (at summary judgment, a court "views the evidentiary record in the light most favorable to ... the non-moving party").

Gregory Spring was the son of Plaintiffs Keri and Eugene Spring, and the brother of Plaintiff Julianne Spring. (Docket No. 142-1, ¶¶ 1-3.) Defendant Diane Lowry was a teacher's aide at the Allegany-Limestone Central School District, where Gregory was a student. (Id., ¶ 6.) Lowry frequently worked in the same classroom as Gregory while he was in middle school but had no contact with him after he completed eighth grade. (Docket No. 142-12 at p. 2.)

Lowry testified that, when Gregory was in eighth grade, she saw him running down the hallways with a group of boys, pushing people over. (Docket No. 142-11 at p. 38-39, 52.) She also testified that one day she asked the group of boys, including Gregory, not to crowd her and the physically-limited student with whom she was working and Gregory responded, "you need to shut the hell up and mind your own business." (Id. at p. 43.) Lowry left discipline for this incident to the teacher in charge. (Id. at p. 45.) She testified that, a few days later, Gregory apologized to her for that incident. (Id. at p. 45.) Lowry also testified that she had seen Gregory bully a student called Z.C. until he cried but she did not provide a date or context for this incident. (Id. at p. 70.)

School disciplinary records indicate that Gregory was disciplined on November 12, 2010, and January 19, 2011, for shoving other students in the hallway. (Docket No. 142-

2

15 at p. 1.) What appears to be a complete record of eight disciplinary incidents in Gregory's record does not contain a record of Gregory either bullying another student or telling Lowry to shut up. (Docket No. 153-6 at pp. 3-6.)

Gregory committed suicide on June 17, 2013. (Docket No. 142-1, ¶ 9.) In the aftermath of his suicide, an anonymous poster wrote the following on the online message board of the funeral home: "Ha ha. He died. I hope he's in hell." (Id., ¶ 15.) A Channel 4 news article covered his suicide. The online comments section for this article contains multiple posts about his suicide and about his mother Keri's allegations that Gregory committed suicide because he had been bullied and that the school district had done nothing to protect him from bullying.[2]  (Id., ¶ 13.)

Lowry engaged in this online conversation. In her first post, she wrote,

> Oh how quick people are to judge and to forget that there are always two sides to every story. As an employee of ALCS District, I know first hand how difficult it is for schools to manage students that are NOT properly disciplined at home. This young man did not commit suicide because he was bullied at school. I read the messages that he posted to his FB (Facebook) page (which has been surprisingly removed) and there was NOTHING said about bullying. There were, however, NUMEROUS posts about his girlfriend and his despondency over their breakup. Some of his posts sent a chill up my spine and I remember feeling saddened that no one saw these warning signs. In today's world, our children, and young adults, use technology to say things that should never be said, post obscene pictures and videos, harass, demean, vent, and yes, display warning signs of their desperate need for help. It's totally unfair and ridiculous to place sole responsibility for horrific events such as this, against any school district. Parents raising children in a technology driven world like we live in today need to set strict guidelines with their children's phones and computers. I am

---

[2] It is likely that this discussion occurred within several days of Gregory's funeral. In messages to a parent in the District, Lowry asked, "what parent would contact a news station the day after your son's funeral?" (Docket No. 142-14 at p. 4.) This suggests that the Channel 4 coverage occurred in the days after the funeral and this discussion ensued shortly after.

shocked at how many parents bring in copies of their children's FB pages filled with hateful and obscene comments and expect the school to do something about it. When did it become the school's responsibility to monitor what a student is posting and/or texting to others while at home? ALCS has amazing teachers and staff – I know because I work with them. I am telling you, there is another side to this story. As an aide in the ALCS District, I was in class with Greg for three years. I could, but choose not to, share what I witnessed (and DID NOT witness) while in classes and walking the hallways going from class to class. It saddens me that Greg chose to end his life in this manner, but what saddens me even more is his mother's desire to place blame solely upon the school district. How did Greg's FB posts go unnoticed? Friends, family members, teachers, employers, the government – all have an influence on our lives and can give us excuses to "blame" our circumstances on other people. We can not change the past, however, and assigning blame will do nothing to help us find solutions. Wouldn't it be better if we worked together to try and understand what happened? Are we really interested in improving our future or are we more concerned about who's at fault?

(Docket No. 153-2 at p. 7.)

In a subsequent post, after other participants responded negatively to her initial

comment, Lowry wrote,

As an employee of the district, and someone who attended many of Greg's classes, I never once witnessed him being the victim of bullying…EVER!  Were you there? No, you were not. So I believe I have every right to speak what I witnessed first hand. I will tell you the very same thing I told another person on this public forum. Let me just say this, I was told by a student, "You need to shut up and mind your own business" when I confronted HIM about HIS repeated and relentless bullying of another student. That is what I witnessed. Maybe you would be well served to adhere to your own advice about remaining silent!

(Id. at p. 4.)

In response to participants' criticism of her handling of the incident she described,

4

Lowry wrote,

> So why do you assume that I "scolded" Greg? You insult your own intelligence by making blind assertions about how the incident was handled. I did not have to "notify" the classroom teacher because he heard the comment. And yes, it was reported to the administration by the teacher. And to question my credentials as an aide is insulting! And what I witnessed was NOT backlash. It was the relentless targeting, and verbal assault upon another student which eventually resulted in the student having to be moved out of all the classes that he and Greg shared. A wise person would not make assumptions without first knowing all the facts!

(Id. at p. 10.)

Another commenter asked, "How do you explain, 'Ha ha. He died. I hope he is in hell' then?" (Docket No. 153-2 at p. 11.) Lowry replied, "I cannot explain who would write such a horrific statement! Obviously someone without much of a conscience." (Id.)

The comments page included, in addition to Lowry's contributions, participants sharing their children's experiences with bullying in the District, expressing anger at the District's handling of bullying, expressing skepticism of the District's claims of investigating bullying, discussing the national problem of bullying in schools, and engaging in a side conversation about homeschooling. (See Docket No. 153-4 at pp. 1-32.)

When asked at her deposition whether she considered whether her comments about Gregory would be hurtful to his family, Lowry stated, "no, I did not think about that." (Docket No. 153-9, ¶ 21; Docket No. 142-12 at p. 21.)

A parent in the District, whom Lowry only met through Facebook messenger, messaged Lowry privately to express support after commenters reacted angrily to Lowry's postings. (Docket No. 142-14 at pp. 1-2.) Lowry expressed her gratitude for the support

and stated that most teachers were afraid of Keri, that Keri would storm into the school demanding to talk to teachers about Gregory's grades, that Gregory was never held accountable for his actions, and that Keri Spring was mentally ill. (Id. at p. 4.) Lowry wrote, "what parent would contact a news station the day after your son's funeral?" (Id.)

The parties dispute the truth of Lowry's statements that Gregory told Lowry to "shut the hell up and mind your own business" in response to her confronting him about bullying. (Docket No. 142-1, ¶ 25; Docket No. 153-9, ¶ 25.) They also dispute whether Lowry, in fact, "witnessed another student cry because of Gregory's treatment of that student." (Docket No. 142-1, ¶ 28; Docket No. 153-9, ¶ 28.)

### III.  DISCUSSION

Plaintiffs claim that Lowry both negligently and intentionally caused them emotional distress when she posted her comments about Gregory in this discussion forum. Lowry moves for summary judgment on Plaintiffs' claims.

In the time since Lowry filed her motion, she passed away. Plaintiffs filed a notice of suggestion of death on December 16, 2021. (Docket No. 167.) On March 16, 2022, Plaintiffs informed this Court that they were having difficulty identifying Lowry's legal representative or successor and requested either that their suggestion of death be considered invalid or that this Court grant them additional time to identify Lowry's successor. (Docket No. 168.) This Court construes Plaintiffs' filing as a motion for additional time pursuant to Federal Rule of Civil Procedure 6 (b). See Perry v. Perry, No. 12-CV-5727 NGG MDG, 2014 WL 2993488, at *2 (E.D.N.Y. July 2, 2014) ("If there is an inability or a significant difficulty in identifying the decedent's legal representative or

successor, a motion could be brought under Federal Rule of Civil Procedure 6(b) to enlarge the time in which to file the motion for substitution.").

Because Lowry's motion for summary judgment will be granted, however, Plaintiffs' motion will be denied as moot.

**A.    Summary Judgment**

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a). A fact is "material" if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion." Addickes v. S.H. Kress and Co., 398 U.S. 144, 158-59, 90 S. Ct.1598, 1609, 26 L. Ed. 2d 142 (1970).  "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). Indeed, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004) (citations omitted).

But a "mere scintilla of evidence" in favor of the nonmoving party will not defeat summary judgment. Anderson, 477 U.S. at 252.  A nonmoving party must do more than cast a "metaphysical doubt" as to the material facts; it must "offer some hard evidence

showing that its version of the events is not wholly fanciful."  Matsushita Elec. Indus. Co.

v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); Wright

v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is

properly supported by documents or other evidentiary materials, the party opposing

summary judgment may not merely rest on the allegations or denials of his pleading....");

D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998).  That is, there must be

evidence from which the jury could reasonably find for the non-moving party.  See

Anderson, 477 U.S. at 252.

In the end, the function of the court is not "to weigh the evidence and determine

the truth of the matter but to determine whether there is a genuine issue for trial."

Anderson, 477 U.S. at 249.  "Assessments of credibility and choices between conflicting

versions of the events are matters for the jury, not for the court on summary judgment."

Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996).

**B.      Negligent Infliction of Emotional Distress**

Lowry argues that Plaintiffs' cause of action for negligent infliction of emotional

distress must be dismissed because Plaintiffs did not experience the danger or proximity

to physical harm required for a claim under New York law. Plaintiffs do not respond to this

argument.

"When a party fails adequately to present arguments," a court may properly

"consider those arguments abandoned," Malik v. City of New York, 841 F. App'x 281, 284

(2d Cir. 2021) (quoting State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada, 374

F.3d 158, 172 (2d Cir. 2004)). This is especially true "in the case of a counseled party"

where "a court may ... infer from a party's partial opposition that relevant claims or

defenses that are not defended have been abandoned." <u>Malik</u>, 841 F. App'x at 284 (quoting <u>Jackson v. Fed. Exp.</u>, 766 F.3d 189, 198 (2d Cir. 2014)). Because Plaintiffs do not present any arguments in defense of their claim for negligent infliction of emotional distress, this Court finds that it has been abandoned.

Summary judgment is also warranted because Plaintiffs fail to raise an issue of fact regarding this claim. A cause of action to recover damages for negligent infliction of emotional distress must "be premised upon a breach of a duty owed directly to the plaintiff which either unreasonably endangers a plaintiff's physical safety or causes the plaintiff to fear for his or her own safety." <u>Waterbury v. New York City Ballet, Inc</u>., No. 15036, 2022 WL 1269447, at *6 (N.Y. App. Div. Apr. 28, 2022); <u>Daluise v. Sottile</u>, 837 N.Y.S.2d 175, 178 (App. Div. 2007); <u>Sheila C. v. Povich</u>, 781 N.Y.S.2d 34 (App. Div. 2004).

Here, Plaintiffs do not allege that Lowry owed them a duty of care, nor that Lowry's conduct endangered their physical safety or caused them to fear for their own safety. <u>See Smith v. Vill. of Brockport</u>, No. 19-CV-6404 CJS, 2022 WL 597465, at *24 (W.D.N.Y. Feb. 28, 2022) (dismissing NIED claim where the record did not indicate that plaintiff suffered physical injury or threat of danger). On this basis, in addition to the basis of abandonment, summary judgment will be granted as to Plaintiffs' claim for negligent infliction of emotional distress.

**C.     Intentional Infliction of Emotional Distress**

A cause of action for intentional infliction of emotional distress in New York has four elements: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." <u>Chanko</u>, 49 N.E.3d

at 1178–79. "'Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community'" Id.

A defendant's "knowledge of a plaintiff's susceptibility to emotional distress can, under New York law, transform non-actionable acts into outrageous conduct." Rich v. Fox News Network, LLC, 939 F.3d 112, 123 (2d Cir. 2019) (citing Howell, 612 N.E.2d at 702, and Restatement (Second) of Torts § 46 (comment f) (1965) ("[t]he extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress.")). "Courts are reluctant to allow recovery under the banner of intentional infliction of emotional distress absent a deliberate and malicious campaign of harassment or intimidation." Lewis Fam. Grp. Fund LP v. JS Barkats PLLC, No. 16CV5255AJNJLC, 2021 WL 1203383, at *12 (S.D.N.Y. Mar. 31, 2021), report and recommendation adopted sub nom. Lewis Fam. Grp. Fund LP, et al., v. JS Barkats PLLC, et al., No. 16-CV-5255 (AJN), 2021 WL 4341080 (S.D.N.Y. Sept. 23, 2021).

The threshold for outrageousness is exceedingly difficult to meet. See, e.g., Chanko, 49 N.E.3d at 1178–79 (the broadcasting of a recording of a patient's last moments of life without consent, where patient was not identified and face was blurred, was not so extreme and outrageous as to satisfy New York's "exceedingly high legal standard"); Seltzer v. Bayer, 709 N.Y.S.2d 21, 23 (App. Div. 2000) (holding that the defendant's alleged dumping of a pile of cement, tossing of lighted cigarettes, and drawing of a swastika on his neighbor's house did not constitute conduct sufficiently outrageous to survive a motion for summary judgment); Leibowitz v. Bank Leumi Tr. Co. of N.Y., 548

10

N.Y.S.2d 513, 514 (App. Div. 1989) (affirming dismissal of IIED claim where plaintiff alleged she was frequently the subject of derogatory, racist remarks).

The Free Speech Clause of the First Amendment—"Congress shall make no law ... abridging the freedom of speech"—can serve as a defense against claims for the intentional infliction of emotional distress. Snyder v. Phelps, 562 U.S. 443, 451–53, 131 S. Ct. 1207, 1215–16, 179 L. Ed. 2d 172 (2011); see also Hustler Mag., Inc. v. Falwell, 485 U.S. 46, 50–51, 108 S. Ct. 876, 99 L. Ed. 2d 41 (1988). Speech is protected by the First Amendment when it deals with matters of public concern, that is, when it can "be fairly considered as relating to any matter of political, social, or other concern to the community." Snyder, 562 U.S. at 451–53 (citing Connick v. Myers, 461 U.S. 138, 146, 103 S. Ct. 1684, 1690, 75 L. Ed. 2d 708 (1983)). The arguably "inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." Rankin v. McPherson, 483 U.S. 378, 387, 107 S. Ct. 2891, 97 L. Ed. 2d 315 (1987).

This protection, however, is not absolute. "[W]hile false speech often must be tolerated in order to foster the free exchange of ideas so integral to our constitutional values, there remain limits upon the right to publish false statements that injure an individual." Holloway v. Am. Media, Inc., 947 F. Supp. 2d 1252, 1263 (N.D. Ala. 2013).

**1. No reasonable jury could find that Lowry's statements constitute extreme and outrageous conduct under New York law.**

Lowry argues that, even if Plaintiffs could prove the facts alleged herein, the conduct at issue does not meet the high standard for outrageousness under New York law. This Court agrees. A reasonable jury could not find Lowry's comments "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds

11

of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.'"
Chanko, 49 N.E.3d at 1171.

To begin, Lowry did not initiate the comments concerning Gregory. Rather, it appears that Keri raised the issue of bullying in the Channel 4 news story, putting the question of whether Gregory was bullied squarely up for public debate.[3] Lowry contributed—perhaps insensitively—to a topic that was already being discussed. Further, she posted on the Channel 4 news site, directing her comments to fellow participants and the public at large, not directly to Plaintiffs. Although it may have been foreseeable that Plaintiffs might read the comments, Lowry did not address her comments directly toward them and her thoughts were largely focused on the more general debate about the handling of bullying in schools.

Nor did Lowry did engage in the kind of "deliberate and malicious campaign of harassment or intimidation" that can make conduct outrageous. Hanly, 2007 WL 747806, at *6. Rather, she made three discrete posts, only portions of which addressed Gregory's behavior. Her conduct is thus distinguishable from that in which courts find outrageousness due to a campaign of harassment. See, e.g., Rich, 939 F.3d 112, 123 (2d Cir. 2019) (plaintiff parents plausibly alleged a "campaign of emotional torture" where news outlet had a source befriend parents of murdered political staffer under false pretenses, then broadcast multiple stories asserting that their son, murdered in a botched robbery, was killed for engaging in political intrigue); Shannon v MTA Metro-N. R. R., 704 N.Y.S.2d 208 (2000) (allegations that defendants intentionally and maliciously engaged

---

[3] Lowry commented in her text messages to the supportive parent, "What parent would contact a news station the day after your son's funeral?" (Docket No. 142-14 at p. 4.) This suggests that Keri initiated the news coverage of Gregory's suicide and her allegations of bullying.

in a pattern of harassment, intimidation, humiliation and abuse, causing plaintiff unjustified demotions, suspensions, lost pay, and psychological and emotional harm over a period of years, were sufficient to support the cause of action for intentional infliction of emotional distress). Finally, calling a child a bully, as part of a larger online discussion of bullying, is simply not something that a jury could reasonably consider "atrocious" or "utterly intolerable in a civilized society." Chanko, 49 N.E.3d at 1171.

It is true that Lowry's comments came at a time when Plaintiffs were freshly grieving the loss of their son and brother. But given the high threshold for outrageous conduct in New York, a reasonable jury could not find that her comments were sufficiently extreme and outrageous under New York law.

Because Lowry is entitled to summary judgment on this basis, this Court will not address the parties' other arguments regarding Lowry's state of mind in making the comments, whether Lowry's comments are protected by the First Amendment, and whether Plaintiffs suffered the requisite severe emotional distress.


### III. CONCLUSION

Because Plaintiffs do not assert the elements of a negligent infliction of emotional distress claim and do not oppose Lowry's motion as to this claim, this Court will grant Lowry's motion as to Plaintiffs' claim for negligent infliction of emotional distress. Further, because a reasonable jury could not find that Lowry's comments were extreme and outrageous under New York law, Lowry's motion for summary judgment on Plaintiffs' intentional infliction of emotional distress claim will also be granted.

## IV.  ORDERS

IT HEREBY IS ORDERED, that Defendant Lowry's Motion for Summary Judgment (Docket Nos. 142, 144) is GRANTED.

FURTHER, that the Clerk of Court is DIRECTED to terminate Defendant Lowry from this case.

FURTHER, that Plaintiffs' motion for an enlargement of time to identify Diane Lowry's legal representative or successor (Docket No. 168) is DENIED AS MOOT.

SO ORDERED.


Dated:       May 17, 2022
             Buffalo, New York


                                    s/William M. Skretny
                                   WILLIAM M. SKRETNY
                                   United States District Judge